[No. B017743. Second Dist., Div. Three. June 30, 1987.]

DARYL F. GATES, as Chief of Police, etc., et al., Petitioners, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; JUAN VILLALAZO GRAJEDA et al., Real Parties in Interest.

COUNSEL

James K. Hahn, City Attorney, Lewis N. Unger, Assistant City Attorney, and Jack L. Brown, Deputy City Attorney, for Petitioners.

No appearance for Respondent.

Michael J. Ortiz, Sandra Pettit and Dennis W. Campbell for Real Parties in Interest.

OPINION

KLEIN, P. J.—Defendants and petitioners the City of Los Angeles, the Los Angeles Police Department (LAPD), Police Chief Daryl F. Gates (Gates), and several individual members of the LAPD (collectively, defendants), petitioned this court for a writ of mandate/prohibition seeking to set aside the trial court's order granting summary adjudication of issues in favor of plaintiffs, Juan Villalazo Grajeda (Grajeda) and Raul Oswaldo Rivera (Rivera) (collectively, plaintiffs).

We granted an alternative writ. Because the trial court erred as to various aspects of its summary adjudication of issues, that order is reversed.

FACTUAL BACKGROUND

1. *Plaintiff Grajeda.*

At approximately 12:30 a.m. on April 24, 1977, LAPD Officers Williamson and Burnette detained Grajeda, a permanent legal resident of the Unit-

ed States, in downtown Los Angeles for jaywalking. After issuing a citation, the officers arrested and booked Grajeda for using a false or forged alien registration receipt card (green card), a felony violation of 18 United States Code (U.S.C.) section 1426, subdivision (b).

Pursuant to a hold request of local officials of the United States Inmigration and Naturalization Service (INS), the LAPD held Grajeda without bail until 10 a.m. on April 25, 1977, when he was given into INS custody. Shortly thereafter, an INS agent examined Grajeda's alien registration card and released him.

Williamson's deposition testimony indicated he had learned to distinguish forged from genuine green cards during LAPD roll call instruction given by immigration officials. Grajeda's card failed both Williamson's field inspection and a "blue light" inspection at the police station. The officer claimed there was a "very high probability" he would again arrest Grajeda for the same offense if presented with the same card.

## 2. *Plaintiff Rivera*

About noon on December 15, 1978, LAPD Officers Moberly and Williams observed Rivera and two companions seated in a parked station wagon in the area of Fourth and Ardmore Streets in Los Angeles. Moberly recalled, "we saw three people sitting in a vehicle that we had never observed parked in that location before, both of us having been assigned to that division and probably that specific area for quite a number of months. And the fact that the two in the back tried to slide down out of our view, that generally disturbs me a little bit. And then speculating on whatever vehicle registration . . . , information we had, which I can't recall what it was, other than the fact that it did not register to that area there."

Upon approaching, Moberly detected the odor of marijuana emanating from an open window of Rivera's vehicle.

Officer Hernandez was summoned to the scene to interview the suspects in Spanish. He also detected the odor of marijuana and recalled the suspects eventually said they were waiting for a friend who had gone into a building to purchase marijuana. Hernandez claimed the suspects had volunteered their undocumented status, indicated they were worried, and expressed confidence in Hernandez's handling of the situation because he was their "brother."

The officers transported the suspects to INS without arresting or booking them for any state or local crime. Williamson admitted basing this decision

upon the belief "they were involved in criminal activity. . . . [T]hey had no identification. . . . [¶] . . . . We had reason to believe that they were either burglars or involved in narcotic activity, and we transported them down to immigration only because they were illegal aliens."

At his deposition, Rivera asserted he had given the officers his driver's license and car registration, both of which were in order. He denied admitting his illegal status but conceded he had been illegally present in this country at that time. He posted bond to secure his release from INS and, thereafter, petitioned for an Immigrant Visa which INS approved on May 22, 1979.

3. *Applicable LAPD Policy and Procedure.*

 a. *1972-1979.*

At the time of both arrests, Special Order No. 68 and its Supplemental Fact Sheet, dated November 24, 1972, embodied LAPD policy regarding arrest for illegal entry into this country.

According to this directive, officers were not to initiate police action with the primary objective of discovering the alien status of a person where no crime-related issues were involved.

Whether or not a suspected illegal alien was booked on criminal charges, the arresting officer was to contact by phone an INS agent who would then interview the detainee to "determine the legality of the suspected person's presence in the United States." INS could place a teletype "hold" on the suspect which became effective after adjudication of any state criminal matter.

Where the detained person was not booked on a criminal charge and contact with the INS revealed illegal status, the LAPD policy required an officer to consult divisional detectives or the watch commander for booking approval. Such approval might be obtained where "there is a likelihood that the release of an illegal alien will create additional police problems. (Example: Family dispute calls, possibility of an assault or ADW occurring, etc.)" If booking approval was denied, the suspect was to be released but the officer was to forward all available information as to the suspect's identity to Detective Headquarters Division (DHD).

With respect to suspected illegal aliens who were neither the object of a police investigation nor subject to booking, an officer "need not notify INS" but instead could merely forward information on the suspect to DHD.

However, in urgent situations, such as fires or other disasters in which a suspected illegal alien was a victim or involved, an officer could notify DHD, which, in turn, would notify INS "who will take immediate action to aid this Department in alleviating the problem."

b. *1979 to present.*

Special Order No. 40, entitled "Undocumented Aliens" and dated November 27, 1979, replaced Special Order No. 68. This Order stated "undocumented alien status in itself is not a matter for police action" and directed officers not to "initiate police action with the objective of discovering the alien status of a person." Additionally, officers were advised not to arrest or book persons for violations of 8 U.S.C. section 1325 (improper entry by alien).

However, "[w]hen an undocumented alien is booked for multiple misdemeanor offenses, a high grade misdemeanor or a felony offense, or has been previously arrested for a similar offense," the arresting officer shall notify DHD of the arrest which, in turn, relays the information to INS via teletype.

c. *Jail Procedures.*

LAPD jail division does not permit an arrestee on whom the INS has placed a hold to post bail. Thus, despite the posting of bond on a state criminal charge, jail division continues to detain an arrestee on whom INS has placed a hold "up to the state limit, which is 48 hours."[1]

4. *Federal Immigration Laws and Regulations.*

The Immigration and Naturalization Act (INA) is codified commencing at 8 U.S.C. section 1101. (*Jean* v. *Nelson* (11th Cir. 1983) 711 F.2d 1455, 1465.) The regulation promulgating process is governed by the Federal Administrative Procedure Act codified at 5 U.S.C. section 551 et seq. Once adopted, administrative rules are published in the Code of Federal Regulations (C.F.R.).

---

[1] The Los Angeles County jail is operated by the Los Angeles County Sheriff. Neither the County of Los Angeles nor Sheriff Sherman Block are parties to this action. For this reason our holding will immediately impact only those arrestees detained at the various jail facilities operated by LAPD. However, the sheriff, like the LAPD, has no justifiable interest in overdetaining an individual otherwise entitled to release, and, given the well-documented crowding of the county jail system, we have no doubt the sheriff will welcome any reduction in the maximum length of an INS hold.

8 U.S.C. section 1357 deals with "Powers of Immigration Officers and Employees—Powers without a warrant." 8 U.S.C. section 1357(a)(2) allows any officer or employee of the Service to arrest without a warrant any alien who "is entering or attempting to enter the United States in violation of any law or regulation" or is "in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States; . . ."

When an INS agent arrests without a warrant for a felony violation of immigration law, "the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States." (8 U.S.C. § 1357(a)(4).)

The regulations concerning the enforcement of the INA are found in 8 C.F.R., entitled "Aliens and Nationality." 8 C.F.R. section 287.3, a subdivision of "Part 287—Field Officers; Powers and Duties," confers certain rights upon an alien arrested by the INS without a warrant pursuant to the authority contained in section 287(a)(2) of the INA (8 U.S.C., § 1357(a)(2)). Such an alien must be examined by an officer other than the arresting officer unless no such other officer is available or such examination "would entail unnecessary delay." Where the examining officer is satisfied the evidence establishes a prima facia case of "entering or attempting to enter the United States in violation of the immigration laws," the matter is referred to an immigration judge or other appropriate action is taken.

When the examining officer is satisfied prima facie evidence exists to establish the "arrested alien is in the United States in violation of the immigration laws," and "[a]fter the examining officer has determined that formal proceedings under sections 236 [exclusion of aliens], 237 [deportation of excluded aliens] or 242 [proceedings to determine deportability of aliens] of the [INA], will be instituted, an alien arrested without warrant of arrest shall be advised of the reason of his arrest and his right to be represented by counsel of his own choice, . . . provided with a list of the available free legal services . . . [and] advised that any statement he makes may be used against him in a subsequent proceedings . . . ."(8 C.F.R. § 287.3.)

Further, 8 C.F.R. section 287.3 directs "a decision will be made within 24 hours or less as to whether [the alien] will be continued in custody or released on bond or recognizance. Unless voluntary departure has been granted . . . , the alien's case shall be presented promptly, and in any event within 24 hours, to the district director, . . . for a determination as

to whether there is prima facie evidence that the arrested alien is in the United States in violation of law and for issuance of an order to show cause and warrant of arrest . . . ."

By comparison, the regulations governing persons arrested by the INS for felonies only require they "be taken without unnecessary delay before another near-by officer empowered to commit persons charged with offenses against the laws of the United States." (8 C.F.R. § 287.1(d).)

## PROCEDURAL HISTORY

In December 1979, Grajeda and Rivera filed a complaint in six counts for injunctive, declaratory, and other relief, seeking, inter alia, a declaration the LAPD's conduct violated their constitutional rights.

In October of 1984, defendants filed a motion for summary judgment. The following month, plaintiffs filed both opposition and a cross-motion for summary adjudication of issues. After a hearing in January 1985, the trial court granted the plaintiffs' motion for summary adjudication of issues and, on October 15, 1985, entered its statement of decision.

The order granting summary adjudication of issues and the statement of decision included the following findings of fact and conclusions of law:

1. The civil provisions of the INA constitute a pervasive regulatory scheme such as to grant exclusive federal jurisdiction over immigration, thereby preempting state enforcement;

2. LAPD 1972-1979 procedure with respect to aliens improperly authorized enforcement of the civil provisions of the INA. By directing the questioning of persons booked for violations of state ofienses about their alien status without probable cause to believe a felony violation of federal law had been committed, or a misdemeanor violation of federal law was being committed in the officers' presence, both the 1972-1979 and the later policy improperly permitted enforcement of the civil provisions of the INA;

3. "The LAPD's authority to arrest, incarcerate or detain a person suspected of violating the immigration laws is proscribed by the limitations placed on federal officers by C.F.R. § 287.3." Both LAPD policies are "constitutionally defective" because each allows "officers to detain, stop, question and arrest" suspected undocumented persons without according them the rights found in 8 C.F.R. 287.3 which persons arrrested without a warrant by the INS pursuant to 8 U.S.C. section 1357 (a)(2) are afforded;

4. The arrest of Grajeda violated his federal and state constitutional rights because the LAPD "acted as an agent of the INS" and thus, "even assuming a 'probable cause' basis for the arrest . . . , his incarceration in excess of 33 hours exceeded the permissible scope of any detention of [*sic*] the INS itself could have imposed upon him without having set bail on his case or having advised him of the charges against him and of his [8 C.F.R. § 287.3] rights."

5. The arrest of Rivera violated his federal and state constitutional rights because there was no probable cause to arrest for a felony violation of the INA and no misdemeanor violation of the INA had been committed in the officers' presence.

## CONTENTIONS

Defendants contend: (1) the regulations governing the conduct of the INS do not apply to the LAPD; (2) the regulations adopted relating to administration of the INA do not establish constitutionally mandated standards of due process; (3) the LAPD policy on undocumented aliens is constitutional.

## DISCUSSION

### 1. *Standard of review.*

■ "The summary judgment procedure, inasmuch as it denies the right of the adverse party to a trial, is drastic and should be used with caution. [Citation.] Summary judgment is properly granted only when the evidence in support of the moving party establishes that there is no issue of fact to be tried. [Citations.]" (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134].)

When there are no material issues of fact and the sole remaining question is one of law, it is the duty of the court to determine the issue of law. (*Angelus Chevrolet* v. *State of California* (1981) 115 Cal.App.3d 995, 1000 [171 Cal.Rptr. 801].) A trial court's ruling as to an issue of law is reviewable on appeal. (*Briarwood Properties, Ltd.* v. *City of Los Angeles* (1985) 171 Cal.App.3d 1020, 1028 [217 Cal.Rptr. 849].)

### 2. *The civil/criminal distinction.*

#### a. *Federal preemption of civil enforcement.*

■ Neither side disputes the exclusive authority of the federal government to enforce the civil provisions of the INA relating to such matters as

admission, exclusion and deportation of aliens. "[T]he Supreme Court has 'repeatedly emphasized that "over no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens.' [Citation.]" (*Lopez* v. *United States I.N.S.* (10th Cir. 1985) 758 F.2d 1390, 1392.)

However, as to criminal matters, "[t]he general rule is that local police are not precluded from enforcing federal statutes. [Citations.]" (*Gonzales* v. *City of Peoria* (9th Cir. 1983) 722 F.2d 468, 474.) Despite the pervasive regulation of the civil provisions of the INA, its criminal statutes "are few in number and relatively simple in their terms. They are not, and could not be, supported by a complex administrative structure. It therefore cannot be inferred that the federal government has occupied the field of criminal immigration enforcement." (*Id.* at p. 475; *People* v. *Barajas* (1978) 81 Cal.App.3d 999, 1004-1007 [147 Cal.Rptr. 195].)

b. *LAPD authority to arrest for criminal violations of federal law.*

■ The propriety of an arrest for a violation of federal law by state peace officers is determined by reference to state law. (*Miller* v. *United States* (1958) 357 U.S. 301, 305 [2 L.Ed.2d 1332, 1336, 78 S.Ct. 1190].) A peace officer may arrest in California (1) when a public offense is committed in the officer's presence, (2) when a person has committed a felony, and (3) when reasonable cause exists to suspect a person has committed a felony, whether or not a felony has, in fact, been committed. (Pen. Code, § 836.)

Therefore, pursuant to Penal Code section 836, an LAPD officer may arrest for a felony violation of federal immigration law any time the officer has reasonable cause to believe such a violation has occurred.

The most commonly encountered misdemeanor violations of federal immigration law are found in 8 U.S.C. section 1325, improper entry into this country.

■ One type of such improper entry, eluding examination or inspection of immigration officers in violation of 8 U.S.C. section 1325(2), has specifically been held to be "consummated at the time an alien gains entry through an unlawful point and does not submit to these examinations." (*United States* v. *Rincon-Jimenez* (9th Cir. 1979) 595 F.2d 1192, 1193-1194.)

Although the other two forms of improper entry proscribed by section 1325, entering the country at a place other than as designated by immigration officers, or obtaining entry by wilfully false or misleading representa-

tions, violations of 8 U.S.C. sections 1325(1) and (3), respectively, were not in issue in *Rincon-Jimenez,* these misdemeanors also appear clearly to be complete upon the improper entry. The *Rincon-Jimenez* court found persuasive language in 8 U.S.C. section 1326 making it a felony to enter, attempt to enter or *be found in* the United States after having been deported or excluded. Because Congress explicitly defined this offense as a continuing one, the misdemeanor matters set forth in section 1325, by clear implication, are complete upon entry.

Once an alien has reached a place of repose within the country, the misdemeanor of improper entry ends. At that point, an LAPD officer may not arrest for this offense because it did not occur in the officer's presence.

INS, on the other hand, might treat an alien suspected of improper entry either civilly, by instituting proceedings to deport or exclude the alien, or criminally, by prosecuting for the illegal entry.

3. *8 C.F.R. section 287.3 does not apply to the LAPD.*

a. *The purpose of 8 C.F.R. section 287.3 in the federal scheme.*

8 C.F.R. section 287.3 addresses two types of aliens whose entry into this country constitute a federal misdemeanor. The first are those "caught red-handed", that is, in the act of entering, or attempting to enter, the country improperly. 8 C.F.R. section 287.3 merely directs "appropriate or required action" be taken in the case of such an alien, i.e., referral to an immigration judge.

The second group of aliens to which 8 C.F.R. section 287.3 applies are those "in the United States in violation of the immigration laws, . . ." As this aspect of the INA is civil in nature and exclusively within the federal domain, there is no reason why the LAPD should provide a suspected illegal alien the same statutory due process rights the INS must provide before deporting or excluding such a person.

Additionally, since 8 C.F.R. section 287.3, on its face, applies only to employees and officers of the INS, the requirement plaintiffs seek to impose on the LAPD was clearly not intended by its drafters. (*People* v. *Barajas, supra,* 81 Cal.App.3d at pp. 1006-1007.)

b. *8 C.F.R. section 287.3 does not establish constitutionally mandated standards of due process.*

 "[A]liens, even those lawfully within the country, do not have most of the constitutional rights afforded to citizens. They may be deported for

considerations of race, politics, activities, or associations that the government could not punish them for if they were citizens. [Citations.] They may be arrested by administrative warrant issued without an order of a magistrate, [citation], and held without bail, [citation]." (*Lopez* v. *United States I.N.S., supra,* 758 F.2d at p. 1393.)

In *INS* v. *Lopez-Mendoza* (1984) 468 U.S. 1032 [82 L.Ed.2d 778, 104 S.Ct. 3479], the United States Supreme Court held the exclusionary rule inapplicable to deportation hearings. Noting the civil character of these proceedings, the court held "the absence of *Miranda* warnings does not render an otherwise voluntary statement by the respondent inadmissible in a deportation case. [Citations.]" (*Id.,* at p. 1039 [82 L.Ed.2d at p. 786]; *Trias-Hernandez* v. *I.N.S.* (9th Cir. 1975) 528 F.2d 366, 368-369; *Avila-Gallegos* v. *I.N.S.* (2d Cir. 1975) 525 F.2d 666, 667.) However, an involuntary statement is inadmissible as violative of fundamental due process. (*Navia-Duran* v. *Immigration & Naturalization Serv.* (1st Cir. 1977) 568 F.2d 803, 810-811.)[2]

Additionally, as a practical matter, suspected aliens derive no particular benefit from an LAPD officer's advisement of the right to remain silent. Because of its civil nature, "in many deportation proceedings the sole matters necessary for the Government to establish are the respondent's identity and alienage—at which point the burden shifts to the respondent to prove the time, place and manner of entry.' [Citation.]" (*INS* v. *Lopez-Mendoza, supra,* 468 U.S. at p. 1043 [82 L.Ed.2d at p. 788].) Proof of alienage is further simplified because an adverse inference may be drawn " 'from the silence of one who is called upon to speak. . . .' " (*Ibid.* [82 L.Ed.2d at p. 789]; *Cabral-Avilia* v. *Immigration & Naturalization Serv.* (9th Cir. 1978) 589 F.2d 957, 959.) Finally, none of the officers deposed in connection with this case had ever been called upon to testify in a deportation hearing. Indeed, in light of the minimal amount of proof required, it is difficult to imagine a case in which such testimony would be needed.

(1) *Trial court's rationale.*

In imposing the same standards of conduct applicable to the INS on the LAPD, the trial court relied on *Chairez* v. *County of Van Buren* (W.D. Mich. 1982) 542 F.Supp. 706. There, local police stopped and questioned the plaintiff in connection with a state crime. Suspecting illegal status, the

---

[2] By contrast, statements elicited by an INS investigator in the absence of *Miranda* warnings (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) are inadmissible in a criminal proceedings where alienage is an element of the crime and the interrogation is reasonably likely to elicit an incriminating response. *(United States* v. *Mata-Abundiz* (9th Cir. 1983) 717 F.2d 1277, 1278-1279.)

state officers contacted INS who interviewed the plaintiff over the phone. Thereafter plaintiff was held in local custody for two days before a face to face interview with INS. The district court permitted a private cause of action under the INA for violations of 8 U.S.C. section 1357(a)(2) as interpreted by 8 C.F.R. section 287.3 for failure to present the alien's case within 24 hours for a determination of prima facie evidence of illegal presence. (*Id.* at pp. 715-716.)

However, in the interim between the trial court's summary adjudication of issues and the present appeal, the district court's ruling in *Chairez* has been reversed. (*Chairez* v. *United States I.N.S.* (6th Cir. 1986) 790 F.2d 554.) Noting the availability of habeas corpus relief as a "significant indication of congressional intent to preclude a damages remedy" (*id.* at p. 547; *Arias* v. *Rogers* (7th Cir. 1982) 676 F.2d 1139, 1142), the court held section "1357 does not create an implied, private cause of action permitting aliens wrongfully detained to sue INS officials for damages." (*Chairez* v. *United States I.N.S., supra,* at p. 548.)

c. *Resolution.*

■■■ For all the foregoing reasons, it makes no sense to require the LAPD, which concededly neither is nor should be involved in the admission, exclusion or deportation of aliens, to abide by the same regulations applicable to INS agents in the administration of these civil functions of the INA.

4. *Application of the foregoing discussion to LAPD's policies on undocumented aliens.*

a. *Policy from 1972-1979.*

The trial court found both the 1972-1979 and the post-1979 policy constitutionally defective because they permitted questioning persons about their immigration status.

■■■ However, LAPD policy from 1972 through 1979 was defective for a more basic reason. By allowing LAPD officers to arrest for civil violations of the INS, the 1972-1979 policy impermissibly intruded upon the federal preserve. Additionally, the policy violated state law because it purported to authorize arrests for misdemeanors which had not occurred in an officer's presence.

b. *Post-1979 Policy.*

LAPD policy no longer permits the detention or arrest of undocumented aliens solely on account of their illegal status. Only when a suspected illegal

alien is arrested on state charges is the arresting officer directed to contact INS to determine whether a hold is to be placed on the individual.

■ Plaintiffs, however, contend the mere questioning of a criminal arrestee about his immigration status is constitutionally defective because its goal is enforcement of the civil provisions of the INA. We disagree.

Where an LAPD officer legitimately comes across information in the course of investigating a crime which reasonably leads to the belief the person arrested is illegally present in this country, nothing in either the state or the federal constitution prevents the officer from advising INS of this data.

In such a situation an LAPD officer may, in some abstract sense, be enforcing the civil provisions of federal immigration law because, absent the arrest and notification, the INS would not have been able to deport or exclude the alien. However, such a technical view improperly ignores important practical considerations.

Where otherwise warranted investigation by local officers leads to evidence of a federal civil or criminal violation, the local authority has the right to exchange information with federal authorities; to deny such an exchange is not reasonable and rewards those federal violators fortunate enough to be arrested by local, rather than federal, officials. The INS's ability to deport or exclude an alien, legally arrested for a state crime and held in state custody, should not turn on so meaningless a distinction.

A July 24, 1984, opinion of the California Attorney General, No. 83-902, 67 Ops.Cal.Atty.Gen. 331, reaches the same result. Finding local authorities are under no legally enforceable duty to report to the INS information about persons who entered the country in violation of 8 U.S.C. section 1325, the opinion concludes such officials, "as a matter of comity and good citizenship," may do so. (*Id.* at p. 332.)

Accordingly, we hold the LAPD's transfer of legitimately obtained arrest information to the INS does not constitute enforcement of the civil provisions of the INA.

c. *LAPD jail procedures should be modified.*

The only remaining question is the permissible duration of an INS hold.

In *Cervantez* v. *Whitfield* (5th Cir. 1985) 776 F.2d 556, plaintiffs sought an injunction against the Texas Department of Public Safety prohibiting the

questioning, detention, arrest and incarceration of persons of Hispanic descent for investigation by INS without the service of show cause orders or setting of bail within 24 hours as provided for in 8 C.F.R. section 287.3.

Although on appeal the case dealt with the plaintiffs' entitlement to attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. section 2412, a stipulation reached between INS and the plaintiffs prior to judgment, in pertinent part, provided: "3. An 'immigration hold' is an authorization made by an immigration officer to a state, county, or other local law enforcement agency which requests the local agency to detain a person for INS for possible future proceedings under the immigration laws. An immigration hold is an arrest without warrant made pursuant to 8 U.S.C. § 1357(a)(2). As such, an immigration hold may only be authorized by an officer of the INS and only when the officer has determined that there is probable cause to believe that the person to be held (a) is an alien, (b) is in the United States in violation of the immigration laws, and (c) is likely to escape before a warrant can be obtained for his arrest.

"4. Pursuant to 8 U.S.C. § 1357(a)(2) and in accordance with INS policy, an immigration hold authorized by an immigration officer expires twenty-four (24) hours after the immigration hold takes effect unless within the 24 hours: (a) the person detained is advised of his rights pursuant to 8 C.F.R. § 287.3 and is seen, in person, by an immigartion [*sic*] officer and examined to determine whether there is probable cause that the person is deportable or excludable, and (b) either (1) a properly executed Order to Show Cause with notice of available free legal services in the area is served on the detainee or, (2) the detainee voluntarily executes a request to depart voluntarily from the United States. It is INS policy that upon expiration of an immigration hold, the state, county, or local law enforcement agency detaining the person must release from custody any person so held." (*Id.* at p. 560.)

This stipulation strikes a reasonable balance between the alien's right to require expedition on the part of the INS while, at the same time, ensuring the LAPD an adequate opportunity to cooperate with the federal authorities. Also, because INS regulations on this subject are highly specific and national uniformity is especially desirable in these matters of solely federal concern, we accord the INS policy great weight. Additionally, the LAPD has no legitimate interest in detaining persons suspected of improper entry longer than an INS hold otherwise justifies.

We therefore adopt those portions of the stipulation dealing with such a hold and find them applicable to the LAPD. ▇ The practical effect of this ruling is to require the LAPD jail division to release any arrestee

suspected of having entered the country in violation of 8 U.S.C. section 1325 and against whom the INS has lodged a hold, within 24 hours after the detainee has posted bond or been released on the detainee's own recognizance on the state offense, rather than holding such person for 48 hours as it appears the present LAPD policy dictates.

### 5. *Application of the foregoing discussion to Grajeda's arrest.*

■ Grajeda was not arrested for either a misdemeanor federal offense or on account of his suspected undocumented status, but because of his purported use of a false or forged immigration document, a felony. As such, 8 C.F.R. section 287.3 would not apply to him, even if he had been arrested by INS. Grajeda's statutory rights are governed by C.F.R. section 287.1(d), requiring only that he be taken "without unnecessary delay before another near-by officer empowered to commit persons charged with offenses against the laws of the United States."

Moreover, the evidence relative to whether the arresting officers had probable cause to believe Grajeda had committed a felony was in such conflict that summary adjudication should not have been granted. Williamson testified Grajeda's green card failed two inspections and indicated he would again arrest an individual presenting the card as genuine. The only evidence controverting Williamson's assertion of probable cause is the conclusion inherent in the INS's release of Grajeda after examination of his card that Williamson had been in error. This clearly is insufficient to summarily adjudicate the propriety of the arrest in Grajeda's favor.

### 6. *Rivera's arrest violated his rights.*

Because Rivera was arrested solely on account of his undocumented status, the LAPD improperly engaged in the civil enforcement of the INA. However, because the officers detained Rivera only long enough to transport him to INS, his damages appear to be de minimis.

### CONCLUSION

The regulations found at 8 C.F.R. section 287.3 do not embody constitutionally mandated standards of due process and are inapplicable to the LAPD. The policy of the LAPD in effect from 1972 through 1979 regarding undocumented aliens improperly permitted officers to arrest for misdemeanors which had not been committed in the officers' presence and thereby allowed enforcement of the civil provisions of the INA. As the policy in effect after 1979 is not subject to this infirmity, it is constitutionally valid.

However, the policy of the LAPD Jail Division by which persons subject to INS hold are held for a maximum of 48 hours must be altered to allow for a maximum hold of 24 hours.

Whether Grajeda's arrest violated his rights presents a factual issue that cannot be resolved on appeal. Rivera was falsely arrested but his damages, if any, appear de minimis.

### DISPOSITION

The alternative writ heretofore issued is discharged. Let a peremptory writ of mandate issue commanding respondent superior court to set aside its order filed October 15, 1985, granting summary adjudication of issues.

Danielson, J., and Arabian, J., concurred.

On July 30, 1987, the opinion was modified to read as printed above.