[No. G036250. Fourth Dist., Div. Three. Nov. 28, 2007.]

CITY OF GARDEN GROVE, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
FELIX KHA, Real Party in Interest.

## COUNSEL

Woodruff, Spradlin & Smart, John R. Shaw, Magdalena Lona-Wiant and Douglas C. Holland for Petitioner.

Jones & Mayer, Martin J. Mayer and Krista MacNevin Jee for California State Sheriffs' Association, California Police Chiefs' Association,

California Peace Officers' Association, California District Attorneys Association, City of Bakersfield, City of Burbank, City of Costa Mesa, City of Dixon, City of Exeter, City of Huntington Beach, City of La Habra, City of Newport Beach, City of Ontario, City of Placentia, City of Redding, City of Santa Clara, City of Tulare, City of Visalia, City of Whittier and City of Yreka as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Joseph D. Elford for Real Party in Interest.

James Humes, Chief Assistant Attorney General, Stacy Boulware Eurie, Assistant Attorney General, Christopher E. Krueger and Teri L. Block, Deputy Attorneys General, for Attorney General Bill Lockyer as Amicus Curiae on behalf of Respondent and Real Party in Interest.

## OPINION

**BEDSWORTH, Acting P. J.**—We confront here the facially anomalous request that we approve state confiscation of a substance which is legal in the circumstances under which it was possessed. This request is terra incognita, as will be most of the many confusing aspects of the current tension between California marijuana laws and those of the federal government. Our conclusions are therefore more a matter of analytical accouchement than precedential accretion. But we are convinced by the Attorney General's argument that governmental subdivisions of the state are bound by the state's laws in this instance and must return materials the state considers legally possessed. We are persuaded due process will allow nothing less. Accordingly, we deny the City of Garden Grove's petition.

During a traffic stop, Garden Grove police seized about a third of an ounce of marijuana from real party in interest Felix Kha. However, because Kha had a doctor's approval to use marijuana for medical reasons, the prosecutor dismissed the drug charge he was facing. The trial court then granted Kha's motion for return of property and ordered the Garden Grove Police Department to give him back his marijuana. Petitioner, the City of Garden Grove, seeks a writ of mandate compelling the trial court to reverse its order. It does not contest the dismissal of the underlying drug charge, nor does it frontally challenge California's medical marijuana laws. Rather, it contends Kha is not entitled to the return of his marijuana because that drug is generally prohibited under federal law. It asks us to make the marijuana's confiscation paramount.

## FACTS

This case was resolved without the presentation of any formal evidence, and none of the proceedings were transcribed. Accordingly, the facts and procedural history are derived from the exhibits and declarations submitted in connection with the writ petition.

On June 10, 2005, Garden Grove police officers stopped Kha for failing to yield at a red light. Kha consented to a search of his car, and the officers seized a cloth bag from his front passenger seat. Inside the bag there was a smoking pipe and a plastic container labeled "Medical Cannabis." The officers opened the container and found 8.1 grams, or less than a third of an ounce, of marijuana.

Kha said he purchased the marijuana from "a lab in Long Beach" and used the drug because he suffers from severe pain. He also said he had a doctor's referral to use marijuana and gave the officers a piece of paper that "looked [to them] like a referral." Nonetheless, the officers seized the marijuana and cited Kha for unlawfully possessing less than one ounce of the drug while driving. (Veh. Code, § 23222, subd. (b).) They also cited him for running the red light. (Veh. Code, § 21453, subd. (a).)

## TRIAL COURT PROCEEDINGS

Kha pleaded guilty to the traffic violation, but he contested the drug charge. During a pretrial conference, he presented the court with a "Physician's Statement" from Dr. Philip A. Denney. Dated June 1, 2005, the statement authorizes Kha to use cannabis as medicine for an undisclosed "serious medical condition." It also contains Kha's acknowledgment that "cannabis remains illegal under federal law." After calling Dr. Denney's office to verify the information contained in the statement, the prosecutor dismissed the drug charge for lack of evidence. The prosecutor, however, opposed Kha's request to have the marijuana returned to him.

The trial court set a hearing on that matter for the following day, at which time Kha filed a formal petition for the return of his property, i.e., the marijuana. According to the prosecutor, the court "explained to the parties that the [drug] charge had been dismissed, the marijuana was, therefore, not illegally possessed, and that in the absence of any authority saying [the court] may not return the property, the property must be returned." The trial court therefore ordered the Garden Grove Police Department to return the marijuana to Kha.

CONTENTIONS

The City of Garden Grove (the City) petitions for a writ of mandate and/or prohibition directing the trial court to vacate its order and enter a new one denying Kha's motion for return of property. The City sees itself "caught in the middle of a conflict between state and federal law"—a position with which we can certainly sympathize—on the issue of medical marijuana and does not want to be perceived as facilitating a breach of federal law by returning Kha's marijuana to him. Because marijuana possession is generally prohibited under federal law, the City contends the trial court's order is legally flawed and constitutes an abuse of discretion. The City also maintains that to the extent state law authorizes or mandates the return of Kha's marijuana, it is preempted by federal law.

We invited and received an informal response from Kha. (See *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 180 [203 Cal.Rptr. 626, 681 P.2d 893].) He claimed he is legally entitled to the return of his marijuana under state law and as a matter of due process. He also argued that federal law is not controlling in this proceeding and that the Tenth Amendment to the United States Constitution effectively prohibits federal interference with California's medical marijuana laws.

In its informal reply, the City argued for the first time that although the drug charge against Kha was dismissed, he is not entitled to the protections of California's medical marijuana laws. The City also reiterated its position that consistent with federal drug policy, Kha's marijuana must be destroyed.

On the heels of the parties' informal briefing, the Attorney General of California sought leave to file an amicus curiae brief. Indeed, the Attorney General claimed the City should have served him with its petition because it was challenging the very constitutionality of California's medical marijuana laws. (See Cal. Rules of Court, rule 8.29(c)(1).)

The City responded with a clarification of its position on the preemption issue. It represented it is not seeking to have the state's medical marijuana laws declared unconstitutional on preemption grounds. Instead, it is simply arguing those laws are preempted to the extent they require the return of federal contraband. In other words, for purposes of this proceeding, the City is not contesting the right of qualified patients to use medical marijuana pursuant to state law; it just does not want to be in the position of having to return marijuana to such a patient once it has been lawfully seized by a member of its police force.

We ordered Kha to show cause why mandate should not issue and granted the Attorney General's request to file an amicus curiae brief. Siding with the

trial court, the Attorney General contends (1) the City lacks standing to challenge the court's order; (2) Kha's possession of marijuana was legal under state law; (3) state law favors the return of lawfully possessed marijuana; (4) federal law does not preclude the return of Kha's marijuana; and (5) under the Tenth Amendment, state courts cannot be compelled to implement federal drug laws. Kha's return to the City's petition echoes these points. His principal argument is that federal law does not override his right under state law and due process to the return of his property.

In its reply brief and in its answer to the Attorney General's amicus curiae brief, the City reiterates its original arguments and continues to question Kha's right to possess marijuana under state law. The City also contends it has standing to challenge the trial court's order because it has a special interest in keeping marijuana off the streets and its police officers may be criminally liable if they return Kha's marijuana to him. The City further argues that while the Tenth Amendment prevents the federal government from ordering the City to take affirmative action to carry out federal law, its police force has the right to enforce federal law on its own accord by seizing and destroying Kha's marijuana.

Finally, we have received an amici curiae brief on behalf of the California sheriffs', police chiefs', and peace officers' associations.[1] Contrary to the Attorney General's position, these local law enforcement associations urge us to overturn the trial court's ruling. They insist ordering the return of Kha's marijuana is not only legally improper, it would undermine police morale and effectiveness and send the wrong message to local law enforcement officers who are involved in the interdiction of illegal drugs.

## STANDING

As a procedural matter, the parties and amici curiae dispute whether the City has standing to challenge the trial court's order. We find that while the City may not have standing in the traditional sense of the term, public policy considerations dictate that we afford the City standing in order to resolve the important and widespread issue presented in this case.

■ The issue of standing may be raised at any time during mandamus proceedings. (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 438 [261 Cal.Rptr. 574, 777 P.2d 610].) As a general rule, "[t]o have standing to seek a writ of mandate, a party must be 'beneficially interested' (Code Civ.

---

[1] Joining these groups are the California District Attorneys Association and the Cities of Bakersfield, Burbank, Costa Mesa, Dixon, Exeter, Huntington Beach, La Habra, Newport Beach, Ontario, Placentia, Redding, Santa Clara, Tulare, Visalia, Whittier and Yreka.

Proc., § 1086), i.e., have 'some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.' [Citation.] This standard . . . is equivalent to the federal 'injury in fact' test, which requires a party to prove by a preponderance of the evidence that it has suffered 'an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." ' [Citation.]" (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 361–362 [87 Cal.Rptr.2d 654, 981 P.2d 499].)

To fully understand the City's interest in this proceeding, it is helpful to examine the role its police department has with respect to seized property. That role, as explained in *Gershenhorn v. Superior Court* (1964) 227 Cal.App.2d 361 [38 Cal.Rptr. 576], is primarily one of custodian for the court. In upholding a defendant's pretrial right to seek the return of property seized without a warrant, the *Gershenhorn* court stated, "[E]ven as to property not yet offered or received in evidence we think that judicial control still exists. We are not now concerned with a private seizure, by a private individual, for some purpose of his own. We deal with property seized by a public officer, acting under the color of his status as a law enforcement officer, and seized solely on the theory that it constitutes a part of the evidence on which judicial action against its owner or possessor will be taken. We regard property so taken and so held as being as much held on behalf of the court in which the contemplated prosecution will be instituted as is property taken and held under a warrant. The seizing officer claims no right in or to the property, or in or to its possession, save and except as the court may find use for it. He must respond, as does any custodian, to the orders of the court for which he acted." (*Id.* at p. 366; see also Pen. Code, § 1536 [property taken on a warrant must be retained by the officer subject to court order]; *In re Seizure of Approx. 28 Grams of Marijuana* (N.D.Cal. 2003) 278 F.Supp.2d 1097, 1105 [the seizing officer is effectively an "agent of the court" with respect to the subject property]; *People v. Superior Court (Laff)* (2001) 25 Cal.4th 703, 713 [107 Cal.Rptr.2d 323, 23 P.3d 563] [officers who seize property "do so on behalf of the court"]; *People v. Superior Court (Loar)* (1972) 28 Cal.App.3d 600, 610 [104 Cal.Rptr. 876] [resolution of criminal proceedings "did not confer on the seizing officer any right to retain the property independent of and beyond that derived from the search warrant"].)

The rules are no different where, as here, the seizure involves a controlled substance and the case is dismissed prior to trial. In that situation, the police may not destroy or otherwise dispose of the seized drugs without prior judicial approval. (See Health & Saf. Code, § 11473.5, subd. (a).)[2] And if the court determines the defendant was in lawful possession of the drugs, then

---

[2] Unless noted otherwise, all further statutory references are to the Health and Safety Code.

they may not be destroyed at all. (*Ibid.*) It is up to the court to decide whether destruction is appropriate in a given case; the police role is limited. (*Ibid.*; *People v. Backus* (1979) 23 Cal.3d 360, 384–385 [152 Cal.Rptr. 710, 590 P.2d 837]; *People v. West* (1990) 224 Cal.App.3d 1337, 1344–1345 [274 Cal.Rptr. 569].)[3]

In light of these considerations, we are hard pressed to see how the City has a special interest in this proceeding. Its police department does have actual custody of the subject marijuana, and the trial court's order requires the department to take certain action with respect to that property, i.e., relinquish it to its owner. So, at least in terms of physical possession, it cannot be gainsaid that the department occupies a unique role with respect to the marijuana. But its duties insofar as looking after the property and ensuring its safe transfer are plainly ministerial. No special discretion, judgment or skill is called for that would suggest the City has a *special* interest in the property. Like the public at large, the City certainly has a general interest in ensuring that controlled substances are only returned to individuals who have a lawful right to possess them. But beyond that, its interest appears tangential. (See *Waste Management of Alameda County, Inc. v. County of Alameda* (2000) 79 Cal.App.4th 1223, 1233–1234 [94 Cal.Rptr.2d 740] [to have standing in mandamus proceeding, the petitioner's interest must be substantial, not indirect or attenuated].)

In seeking to cobble together a standing argument, the City claims the legalization of medical marijuana has contributed to a marked increase in violent crime in Garden Grove and other cities throughout the state, thereby impacting the City's citizenry and its police force. To support this claim, the City relies on a document entitled, "Riverside County District Attorney's Office White Paper, Medical Marijuana: History and Current Complications." That document, however, does not say anything about the City. And the City does not cite any authority in support of its request for us to take judicial notice of the document. Finding no basis upon which to grant the request, we deny it. (See Evid. Code, § 450 et seq.) Suffice it to say, there is nothing in the record of this particular case to indicate a link between medical marijuana—in Riverside County or anywhere else—and violent crime in Garden Grove. (See generally *Gonzales v. Raich* (2005) 545 U.S. 1, 63 [162 L.Ed.2d 1, 125 S.Ct. 2195] (dis. opn. of Thomas, J.) ["many law enforcement officials report that the introduction of medical marijuana laws has *not* affected their law enforcement efforts." (Italics added.)].)

---

[3] A nonapplicable exception to this rule allows law enforcement, if certain requirements are satisfied, to summarily destroy that amount of a suspected controlled substance that exceeds 10 pounds in gross weight. (§ 11479.)

The City also worries about the possibility it may be viewed as aiding and abetting a violation of federal law if its officers return Kha's marijuana to him. To be liable as an aider and abettor, a defendant must not only know of the unlawful purpose of the perpetrator, he must also have the specific intent to commit, encourage or facilitate the commission of the offense. (*People v. Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318].) Stated differently, the defendant must associate himself with the venture and participate in it as in something that he wishes to bring about and seek by his actions to make it succeed. (*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.* (1994) 511 U.S. 164, 190 [128 L.Ed.2d 119, 114 S.Ct. 1439].) Even though Kha would be in violation of federal law by possessing marijuana, it is rather obvious the City has no intention to facilitate such a breach. Its challenge to the superior court's order is clear proof of that, and in future cases the existence of case law compelling it will resolve this issue.

We note that, in an analogous case, the court in *Conant v. Walters* (9th Cir. 2002) 309 F.3d 629 upheld an injunction prohibiting the federal government from enforcing a policy that threatened to punish doctors for recommending medical marijuana to their patients. The government attempted to justify the policy on the basis such recommendations, although necessary to invoke the protections of California's medical marijuana law, could lead to violations of the federal drug laws. Indeed, it argued doctors providing a recommendation for the use of marijuana could be seen as aiding and abetting, or conspiring in, the violation of such laws. But the *Conant* court ruled a doctor's anticipation of a patient's possible violation of federal law "does not translate into aiding and abetting, or conspiracy. . . . Holding doctors responsible for whatever conduct the doctor could anticipate a patient *might* engage in after leaving the doctor's office is simply beyond the scope of either conspiracy or aiding and abetting." (*Id.* at pp. 635–636.)

Likewise here, holding the City or individual officers responsible for any violations of federal law that might ensue from the return of Kha's marijuana would appear to be beyond the scope of either conspiracy or aiding and abetting. No one would accuse the City of willfully encouraging the violation of federal law, were it merely to comply with the trial court's order. The requisite intent to transgress the law is so clearly absent here that the argument is no more than a straw man.

Moreover, in light of the federal immunity statute, it seems rather unlikely that any officer involved in carrying out the trial court's order would be subject to liability for handling Kha's marijuana. Title 21 United States Code section 885(d) provides, "Except as provided in sections 2234 and 2235 of title 18 [respecting illegal procurement and execution of search warrants], no civil or criminal liability shall be imposed by virtue of this subchapter upon

any duly authorized Federal officer lawfully engaged in the enforcement of this subchapter, or upon any duly authorized officer of any State, territory, political subdivision thereof, . . . who shall be lawfully engaged in the enforcement of any law or municipal ordinance relating to controlled substances."

The statute "confers immunity on all state and federal law enforcement officers engaged in the enforcement of the [federal Controlled Substances] Act or of any state or municipal law relating to controlled substances." (*State v. Kama* (2002) 178 Or.App. 561, 564 [39 P.3d 866].) Thus, it did not matter in *Kama* that the Portland police might be seen as violating federal law by returning marijuana to an individual who was entitled to use the drug under Oregon's medical marijuana law. Because 21 United States Code section 885(d) shields police officers from federal liability, the court determined the Portland police had to return the marijuana to the defendant in that case. (*State v. Kama, supra,* 39 P.3d at pp. 867–868.)

The City correctly notes the Oregon law at issue in *Kama,* unlike California's medical marijuana laws, expressly requires the return of a defendant's cannabis if he is deemed to be a lawful user. (See *State v. Kama, supra,* 39 P.3d at p. 867.) However, the applicability of 21 United States Code section 885(d) does not hinge on such a requirement; the statute "makes law enforcement personnel immune from any civil or criminal liability arising out of their handling of controlled substances as part of their official duties." (*State v. Kama, supra,* 39 P.3d at p. 867.) There can be little question the Garden Grove police would be acting pursuant to their official duties, were they to comply with the trial court's order to return Kha's marijuana to him. For that reason, the chance they would be subject to federal liability for so doing seems nugatory. (Cf. *U.S. v. Rosenthal* (9th Cir. 2006) 454 F.3d 943, 947–948 [private citizen who cultivated marijuana for distribution at a cannabis cooperative was not entitled to immunity from federal drug prosecution because he was not involved in the enforcement of any drug laws].)[4]

In short, it seems the City and its police officers really have nothing to lose by returning Kha's marijuana to him. The possession charge against Kha having been dismissed, the marijuana is not needed as part of an ongoing criminal prosecution. (Cf. *People v. Superior Court (Shayan)* (1993) 21 Cal.App.4th 621 [26 Cal.Rptr.2d 173] [police not required to return allegedly stolen property while criminal proceedings were still pending].) And for

---

[4] In *Rosenthal,* the court suggested in dicta that federal immunity will not attach under 21 United States Code section 885(d) if the state law being enforced contradicts federal law. (See *U.S. v. Rosenthal, supra,* 454 F.3d at p. 948.) That was not a consideration in the *Kama* case, however, and the extent to which the state law in question conflicts with federal law strikes us as bearing more on the issue of preemption, discussed *post,* than immunity.

reasons we have explained, there is little danger the City or its officers would be perceived as aiding and abetting, or could be held responsible for, any possible violation of federal law if they returned Kha's marijuana to him. Simply put, it does not appear the City would be adversely affected if its officers carried out the trial court's order in this case. (See *Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793, 796–797 [166 Cal.Rptr. 844, 614 P.2d 276].)

That said, we are mindful this case involves an important issue related to California's medical marijuana laws. As we explain below, those laws are intended to give qualified patients the right to obtain and use marijuana for medical purposes. But if the City prevails, the police could thwart that objective by withholding marijuana they have seized from qualified patients, even when the patient is no longer subject to state criminal prosecution. Whether, as the City contends, this is a necessary consequence of federal drug policy is a question of first impression and one that is of considerable importance to those who rely on cannabis for medicinal purposes.

Moreover, media reports indicate the question of whether local authorities must return lawfully seized marijuana to its owner once state criminal proceedings have been terminated in the owner's favor is a topical issue that has produced inconsistent outcomes throughout the state. (See, e.g., *Sonoma County judge orders man's medicinal marijuana destroyed*, Orange County Register (Apr. 19, 2007) <http://www.ocregister.com/ocregister/news/state/ article_1663210.php> [as of Nov. 28, 2007]; Pemberton, *Police Return Seized Pot*, San Luis Obispo Tribune (Jan. 4, 2003) <http://www.marijuana.org/ SLOtribune1-04-03.htm> [as of Nov. 21, 2006]; Woods, *Sheriff Returns Pot*, The Pinnacle (Apr. 27, 2002) <http://216.167.102.130/pinnacle4-27-02.htm> [as of Nov. 21, 2006]; Panta, *Prosecutors Drop Effort to Keep Pot From Owner*, Desert Dispatch (Apr. 16, 1999) <http://www.marijuana.org/ DesertDisp4-16-99.html.> [as of Nov. 21, 2006]; Metcalfe, *Simi Valley Police Return Marijuana Plants to Patient*, Los Angeles Times (June 20, 1998) <http://www.marijuana.org/PRSimiValley.html> [as of July 24, 2007].)

■ These considerations militate strongly in favor of granting the City standing. (See *Brandt v. Superior Court* (1985) 37 Cal.3d 813, 816 [210 Cal.Rptr. 211, 693 P.2d 796] [reviewing mandamus petition due to "the compelling circumstances presented" and because case was of "widespread interest"]; *Marron v. Superior Court* (2003) 108 Cal.App.4th 1049, 1056 [134 Cal.Rptr.2d 358] [standing granted where petition presented a "significant issue of first impression"]; *Anderson v. Superior* Court (1989) 213 Cal.App.3d 1321, 1328 [262 Cal.Rptr. 405] [entertaining writ petition because it presented issues of great public interest that needed prompt resolution].) So does the fact this case implicates constitutional concerns respecting the relationship

between state and federal law. Courts have recognized that, consistent with our federal system of government, state political subdivisions should be given standing to invoke the supremacy clause to challenge a state law on preemption grounds. (See *Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1, 5–10 [227 Cal.Rptr. 391, 719 P.2d 987], relying on *Rogers v. Brockette* (5th Cir. 1979) 588 F.2d 1057 and *San Diego Unified Port Dist. v. Gianturco* (S.D.Cal. 1978) 457 F.Supp. 283.) Standing is also favored if an interested party may otherwise find it difficult or impossible to challenge the decision at issue. (See, e.g., *Driving Sch. Assn. of Cal. v. San Mateo Union High Sch. Dist.* (1992) 11 Cal.App.4th 1513, 1519 [14 Cal.Rptr.2d 908].) And here it appears quite likely the City will not be able to obtain judicial review of the trial court's order unless it is afforded standing in this proceeding. For all these reasons, we conclude the City has standing to challenge the trial court's order.

## STATE LAWS RESPECTING MEDICAL MARIJUANA

In California, marijuana is classified as a schedule I controlled substance and is listed as a hallucinogenic drug. (See § 11054, subd. (d)(13).) While possession of marijuana is generally prohibited, its use for medicinal purposes has been legal under state law for over a decade. Passed via Proposition 215, and codified in section 11362.5, the Compassionate Use Act of 1996 (CUA) provides:

"(b)(1) The people of the State of California hereby find and declare that the purposes of the [CUA] are as follows:

"(A) To ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief.

"(B) To ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction.

"(C) To encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana.

"(2) Nothing in this section shall be construed to supersede legislation prohibiting persons from engaging in conduct that endangers others, nor to condone the diversion of marijuana for nonmedical purposes.

"(c) Notwithstanding any other provision of law, no physician in this state shall be punished, or denied any right or privilege, for having recommended marijuana to a patient for medical purposes.

"(d) Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician.

"(e) For the purposes of this section, 'primary caregiver' means the individual designated by the person exempted under this section who has consistently assumed responsibility for the housing, health, or safety of that person." (§ 11362.5.)

■ In *People v. Mower* (2002) 28 Cal.4th 457 [122 Cal.Rptr.2d 326, 49 P.3d 1067], the California Supreme Court determined the CUA does not provide complete immunity from arrest and prosecution; rather, the statute provides a "limited immunity" that allows a defendant "to raise his or her status as a qualified patient or primary caregiver as a defense at trial . . . [or] . . . prior to trial on the ground of the absence of reasonable or probable cause to believe that he or she is guilty." (28 Cal.4th at p. 464.) When applicable, however, the CUA "renders possession and cultivation of the marijuana noncriminal for a qualified patient or primary caregiver." (28 Cal.4th at p. 471.) The possession and cultivation become just as lawful as "the possession and acquisition of any prescription drug." (*Id.* at p. 482.)

■ In 2003, the Legislature enacted the Medical Marijuana Program (MMP) to, inter alia, "promote the fair and orderly implementation of the CUA. [Citation.]" (*People v. Wright* (2006) 40 Cal.4th 81, 85 [51 Cal.Rptr.3d 80, 146 P.3d 531].) The MMP created a program for the issuance of identification cards to qualified patients and primary caregivers. (§ 11362.71 et seq.) Because the program is voluntary, one need not obtain an identification card to be entitled to the protections it provides. (§ 11362.765, subd. (b); *People v. Wright, supra*, 40 Cal.4th at pp. 93–94 [the MMP applies to both cardholders and noncardholders alike].)

"Those protections include[] immunity from prosecution for a number of marijuana-related offenses that had not been specified in the CUA, *among them transporting marijuana.* 'Subject to the requirements of this article, [qualified patients and primary caregivers] shall not be subject, on that sole basis, to criminal liability under Section 11357 [possession of marijuana], 11358 [cultivation of marijuana], 11359 [possession for sale], *11360 [transportation]*, 11366 [maintaining a place for the sale, giving away or use of

marijuana], 11366.5 [making available premises for the manufacture, storage or distribution of controlled substances], or 11570 [abatement of nuisance created by premises used for manufacture, storage or distribution of controlled substance].' (§ 11362.765, subd. (a.).)" (*People v. Wright, supra,* 40 Cal.4th at p. 93, italics added.)

■ This expansion of protected activities "represents a dramatic change in the prohibitions on the use, distribution and cultivation of marijuana for persons who are qualified patients or primary caregivers . . . ." (*People v. Urziceanu* (2005) 132 Cal.App.4th 747, 785 [33 Cal.Rptr.3d 859].) In enacting the MMP, the Legislature quite clearly intended to broaden the scope of the CUA in order to facilitate greater access to marijuana for those patients in need of the drug. (See generally Note, *It's High Time: California Attempts to Clear the Smoke Surrounding the Compassionate Use Act* (2004) 35 McGeorge L.Rev. 545, 560 [the MMP "succeeds in bolstering and expanding California law that supports the right of seriously ill Californians to obtain and use medical marijuana"].) And one way the Legislature sought to achieve this goal was by authorizing qualified patients to transport marijuana intended for their own personal medical use. (*People v. Wright, supra,* 40 Cal.4th at p. 93.)

## KHA'S RIGHT TO INVOKE THE CUA AND MMP

In the trial court, the prosecution did not dispute Kha's assertion he was a qualified patient who was entitled to the protections afforded under the CUA and MMP. After personally verifying the information contained in the "Physician's Statement" Kha provided, the prosecutor dismissed the drug charge that was pending against him for insufficient evidence. Accordingly, no formal evidence was presented on the issue.

In its petition for writ of mandate, the City likewise did not dispute Kha's right to invoke California's medical marijuana laws. However, in its subsequent filings with this court, the City has put forth various reasons as to why it believes Kha does not have that right. Namely, (1) he obtained his marijuana illegally; (2) he does not have a qualifying illness; and (3) he was not charged with a requisite offense. In other words, the City challenges the applicability of the CUA and MMP in this case on both factual and legal grounds.

From a factual standpoint, the burden of proving the foundational elements for a medical marijuana defense rests with the defendant. (See *People v. Mower, supra,* 28 Cal.4th at p. 481 [the defendant is merely required to raise a reasonable doubt concerning the existence of those foundational facts]; *People v. Frazier* (2005) 128 Cal.App.4th 807, 816–822 [27 Cal.Rptr.3d 336]

[same].) However, in this case, the prosecutor impliedly accepted the validity of that defense based on Kha's presentation of informal evidence, which obviated the need for Kha to present formal evidence on the issue. Under these circumstances, it would be unfair to second-guess the evidentiary basis for Kha's defense. Because the prosecutor led Kha to believe his marijuana possession was protected under California law, and because the prosecutor did not demand further proof on the issue, he effectively waived any evidentiary issues for purposes of this proceeding, and we discern no basis for according the City a more advantageous position here than the prosecution. (See *People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6 [69 Cal.Rptr.2d 917, 948 P.2d 429] [waiver rules preclude appellate court from considering issues involving the admission of evidence that were not raised in the trial court].)[5]

Waiver principles notwithstanding, the City's factually based arguments are unpersuasive. The City argues Kha failed to prove he lawfully acquired the marijuana in question. Noting that at the time of his arrest Kha told the police he acquired the marijuana from "a lab in Long Beach," the City maintains this proves he neither cultivated it himself nor acquired it from a "primary caregiver," as that term is defined under the MMP.

■ But that does not seem to matter. "A person is entitled to the protections of the CUA if that person is a 'seriously ill' Californian whose use of marijuana 'has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of . . . any . . . illness for which marijuana provides relief.' [Citation.]" (*People v. Wright, supra,* 40 Cal.4th at p. 94, fn. omitted.) Nothing in the CUA or MMP appears to require a qualified patient to provide evidence regarding the source of his or her marijuana.

The City also disputes whether Kha was ill enough to invoke the CUA and MMP. Specifically, it maintains Kha failed to prove he had a chronic or persistent illness for which marijuana may be beneficial. Again, this issue was not contested below, so it is hard to fault Kha for not providing a more detailed account of his medical condition, and it would be a denial of due process to rule against him on a point he was never required to prove. At any rate, the statement from his physician states Kha has a serious medical condition and may benefit from the use of medical cannabis, and that puts Kha in the category of persons the CUA and MMP were designed to protect. (See §§ 11362.5, subd. (b)(1)(A) [CUA covers enumerated illnesses and any

---

[5] An argument can also be made that the City waived the issue of Kha's right to invoke the CUA and MMP by failing to raise it in its initial petition. (See *Wurzl v. Holloway* (1996) 46 Cal.App.4th 1740, 1754, fn. 1 [54 Cal.Rptr.2d 512] [" 'A point not presented in a party's opening brief is deemed to have been abandoned or waived.' "].)

other ailment for which marijuana provides relief], 11362.7, subd. (h) [MMP covers enumerated medical conditions and any other chronic or persistent medical symptom that may cause serious harm to patient].)

■ We now turn to the City's argument that, as a matter of law, the CUA and MMP are inapt in this case. By their terms, those enactments apply only to certain drug offenses that are contained in the Health and Safety Code. (§§ 11362.5, subd. (d), 11362.765, subd. (a).) Because Kha was charged with violating the Vehicle Code, the City claims he is outside the scope of those enactments. We cannot agree.

Although the CUA speaks only to the possession and cultivation of marijuana (§ 11362.5, subd. (d) [referencing §§ 11357 & 11358]), the MMP is more broadly intended to protect a qualified patient "who transports . . . marijuana for his or her own personal medical use." (§ 11362.765, subd. (b)(1); see *People v. Wright, supra*, 40 Cal.4th at p. 93.) As we have explained above, the record indicates Kha is such a patient. However, the only transportation statute referenced in the MMP is section 11360. (See § 11362.765, subd. (a).) Subdivision (a) of section 11360 makes it a felony to transport marijuana, and subdivision (b) of section 11360 renders such conduct a misdemeanor in cases where the transportation involves not more than 28.5 grams (1.0053 ounces) of marijuana, other than concentrated cannabis.

■ The MMP does not mention Vehicle Code section 23222, subdivision (b), the law with which Kha was charged. That provision states that "[e]xcept as authorized by law, every person who possesses, while driving a motor vehicle . . . not more than one avoirdupois ounce [28.3495 grams] of marijuana, other than concentrated cannabis . . . is guilty of a misdemeanor . . . ." Obviously, a violation of this provision also constitutes a violation of section 11360, subdivision (b). The Vehicle Code provision is simply a more specific statute covering the act of driving, as opposed to other methods of transportation.

■ We are therefore impelled to the conclusion it would be illogical to find the MMP covers one provision, but not the other. Such a result would lead to the absurd consequence of permitting a defendant who drives with a large amount of marijuana to invoke the MMP (see, e.g., *People v. Wright, supra*, 40 Cal.4th at pp. 95–98 [defendant who drove with over a pound of marijuana in his car was entitled to invoke the MMP]), while excluding drivers who transport the small amount covered by the Vehicle Code section. We cannot construe the law to permit such a clearly unintended and patently nonsensical result. (Cf. *People v. Trippet* (1997) 56 Cal.App.4th 1532, 1550 [66 Cal.Rptr.2d 559] [pre-MMP case allowing defendant to invoke CUA as a defense to the charge of transporting marijuana under § 11360, even though that offense is not mentioned in the CUA].)

 There is an additional, even more fundamental reason why qualified patients who are charged with violating Vehicle Code section 23222, subdivision (b) should be included within the ambit of the state's medical marijuana laws. As Kha notes, that section prohibits driving with marijuana, "[e]xcept as authorized by law." (Veh. Code, § 23222, subd. (b).) Since the MMP allows the transportation of medical marijuana (§ 11362.765, subd. (b)(1); *People v. Wright, supra,* 40 Cal.4th at pp. 93–94), the MMP effectively *authorizes the conduct described in Vehicle Code section 23222, subdivision (b),* when, as here, the conduct at issue is the transportation of a small amount of medical marijuana for personal use—conduct "authorized by law."

Consequently, the fact Kha was charged with violating the Vehicle Code, as opposed to the Health and Safety Code, is of no moment. Because the MMP encompasses the very conduct underlying his alleged transgression, i.e., transportation, and because the record indicates the marijuana in question was for Kha's own personal medical use, we have no reason to dispute the prosecutor's implied determination that for purposes of state law, Kha was in legal possession of the marijuana that was found in his car.[6]

## FEDERAL TREATMENT OF MARIJUANA

While there is no shortage of learned discourse pertaining to marijuana, misunderstanding about it still abounds. For example, many would be surprised to learn the federal government did not directly criminalize the possession and sale of marijuana until 1970. (See *Gonzales v. Raich, supra,* 545 U.S. at pp. 10–12.) Before then, the drug was subject to various tax and regulatory schemes that restricted its usage, but it was not banned outright or considered illegal per se. (*Ibid.*) Equally surprising, perhaps, is that there is a "genuine difference of expert opinion" as to whether cannabis has therapeutic value to certain individuals. (*Conant v. Walters, supra,* 309 F.3d at p. 643 (conc. opn. of Kozinski, J.).) While there is evidence marijuana use "may be appropriate for a small class of patients who do not respond well to, or do not tolerate, available prescription drugs" (*id.* at pp. 640–641, fn. omitted), and its use in such cases has prompted growing acceptance of medical marijuana at the state level (*id.* at p. 643 [noting "Alaska, Arizona, Colorado, Maine, Nevada, Oregon and Washington . . . have followed California in enacting medical marijuana laws by voter initiative"]), the drug is now generally prohibited under federal law (*id.* at p. 640; see generally Comment, *The Medical Use of Marijuana: State Legislation, Judicial Interpretation and Federal Drug Laws* (2002) 4 J. Legal Advoc. & Prac. 156 [discussing medical marijuana enactments and federal drug laws]).

---

[6] We note there is nothing in the record suggesting Kha was smoking marijuana in his car, an activity that would not be covered under the MMP. (See § 11362.79.)

■ Under the Controlled Substances Act (CSA) (21 U.S.C. § 801 et seq.), it is "unlawful for any person knowingly or intentionally to possess a controlled substance unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice . . . ." (21 U.S.C. § 844(a).) The exception regarding a doctor's prescription or order does not apply to any controlled substance Congress has classified as a schedule I drug, such as marijuana. (See 21 U.S.C. §§ 812(c)(10), 829; *United States v. Oakland Cannabis Buyers' Cooperative* (2001) 532 U.S. 483, 492, fn. 5 [149 L.Ed.2d 722, 121 S.Ct. 1711].) Schedule I drugs are categorized as such because they have (1) a "high potential for abuse," (2) no "currently accepted medical use in treatment in the United States," and (3) "a lack of accepted safety for use . . . under medical supervision." (21 U.S.C. § 812(b)(1).)

Congress's intent to preclude the use of marijuana for medicinal purposes is reflected in this statutory scheme: "By classifying marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, the manufacture, distribution, or possession of marijuana became a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration pre-approved research study. [Citations.]" (*Gonzales v. Raich, supra*, 545 U.S. at p. 14.) "[S]imple possession" of marijuana is a misdemeanor (21 U.S.C. § 844(a)), and possession for "personal use" renders the offender "liable to the United States for a civil penalty in an amount not to exceed $10,000" (21 U.S.C. § 844a(a)). For purposes of this proceeding, Kha does not dispute he was in violation of federal law by possessing marijuana in his car.[7]

## THE LEGALITY OF KHA'S POSSESSION UNDER SECTION 11473.5

Having determined that Kha's marijuana possession was legal under state law, but illegal under federal law, and that we should hear the City's complaints about the order of the court below, we come, at long last, to the central question presented in this case: Is Kha entitled to the *return* of his marijuana? In examining this issue, we first turn to section 11473.5, the statute governing the disposition of controlled substances in cases that have been dismissed before trial.

Section 11473.5 provides, "All seizures of controlled substances, instruments, or paraphernalia used for unlawfully using or administering a controlled substance which are in possession of any city, county, or state official

---

[7] We also notice, at the City's request, that "The United States is a party to the Single Convention on Narcotic Drugs, 1961, and other international conventions designed to establish effective control over international and domestic traffic in controlled substances" (21 U.S.C. § 801(7)), including cannabis. (See Evid. Code, § 451, subd. (a).)

as found property, or as the result of a case in which no trial was had or which has been disposed of by way of dismissal or otherwise than by way of conviction, shall be destroyed by order of the court, *unless the court finds that the controlled substances, instruments, or paraphernalia were lawfully possessed by the defendant.*" (§ 11473.5, subd. (a), italics added.)

Relying on *Ross v. Ragingwire Telecommunications, Inc.* ▌ (Cal.App), review granted November 5, 2005, S138130, the City argued the federal prohibition against marijuana possession rendered Kha's possession unlawful for purposes of section 11473.5. However, shortly after the City filed its petition in this case, the Supreme Court granted review in *Ross*, so that case has no precedential value. (Cal. Rules of Court, rules 8.1105(e)(1), 8.1115(a).)

There is, however, a pair of cases from the Third Appellate District that shed light on the issue before us. In *People v. Bianco* (2001) 93 Cal.App.4th 748 [113 Cal.Rptr.2d 392], the court upheld a probation condition prohibiting the use of marijuana, even though the defendant was a qualified patient under the CUA. The court reasoned that because marijuana possession is illegal under federal law, the condition was "reasonably directed at defendant's future criminality." (93 Cal.App.4th at p. 753.)

But in *People v. Tilehkooh* (2003) 113 Cal.App.4th 1433 [7 Cal.Rptr.3d 226], the court held the CUA "provides a defense to a probation revocation based on marijuana possession or use." (*Tilehkooh*, at p. 1445.) The People argued the defendant's marijuana possession was a violation of his probation, citing the condition that he obey not only the laws of California, but also the laws of the United States. However, the court was not persuaded. It explained, "The People have misunderstood the role that the federal law plays in the state system. The California courts long ago recognized that state courts do not enforce the federal criminal statutes. 'The State tribunals have no power to punish crimes against the laws of the United States, *as such.* The same act may, in some instances, be an offense against the laws of both, and it is only as an offense against the State laws that it can be punished by the State, in any event.' (*People v. Kelly* (1869) 38 Cal. 145, 150 . . . ; see also *People v. Grosofsky* (1946) 73 Cal.App.2d 15, 17–18 [165 P.2d 757].)" (*People v. Tilehkooh, supra*, 113 Cal.App.4th at pp. 1445–1446, fn. omitted.)

Continuing, the *Tilehkooh* court reasoned, "Since the state does not punish a violation of the federal law 'as such,' it can only reach conduct subject to the federal criminal law by incorporating the conduct into the state law. The People do not claim they are enforcing a federal criminal sanction attached to the federal marijuana law. Rather, they seek to enforce the state sanction of probation revocation which is solely a creature of state law. [Citation.] The

state cannot do indirectly what it cannot do directly. That is what it seeks to do in revoking probation when it cannot punish the defendant under the criminal law. [¶] . . . [¶] California courts do not enforce the federal marijuana possession laws when defendants prosecuted for marijuana possession have a qualified immunity under [the CUA]. Similarly, California courts should not enforce federal marijuana law for probationers who qualify for the immunity provided by [the CUA]." (*People v. Tilehkooh, supra,* 113 Cal.App.4th at pp. 1446–1447.)

*Tilehkooh's* reasoning is apropos here, insofar as the City is not attempting to enforce a federal sanction attached to the federal marijuana laws. Instead, it seeks to enforce the sanction of property destruction under state law as expressed in section 11473.5. But to paraphrase *Tilehkooh,* the City cannot do indirectly what it could not do directly. That is what it seeks to do in destroying Kha's marijuana when it cannot punish him under the criminal law for possessing it.

*Gates v. Superior Court* (1987) 193 Cal.App.3d 205 [238 Cal.Rptr. 592] (*Gates*) and *People v. Barajas* (1978) 81 Cal.App.3d 999 [147 Cal.Rptr. 195], upon which the City relies, do not undermine the reasoning of *Tilehkooh* because those decisions deal with the question of whether state police officers have the authority to *arrest* individuals for certain violations of federal law. (See also *Marsh v. United States* (2d Cir. 1928) 29 F.2d 172 [seminal opinion by Judge Learned Hand answering this question in the affirmative].) The validity of Kha's arrest is not at issue in this case.[8] What's more, there is no question the officers who arrested Kha were acting pursuant to state, as opposed to federal, law.

The distinction between mere arrest by local police agencies and a full-on prosecution in state courts is an important one. *Gates* was a case in which the Los Angeles Police Department, investigating violations of state law, came across information suggesting their suspects were in the country illegally. They notified Immigration and Naturalization Services, and Gates complained this was improper enforcement by state officers of a federal statute. But as the *Gates* court recognized, this was not sufficient state involvement to constitute "enforcement" of the federal statutes. "Where otherwise warranted investigation by local officers leads to evidence of a federal civil or criminal violation, the local authority has the right to exchange information with federal

---

[8] Although Kha does not challenge the legality of his arrest, he does request that we take judicial notice of the California Highway Patrol (CHP) procedures for arresting marijuana-transporting motorists who invoke the CUA during the course of a police encounter. However, the request is not accompanied by any authority and the document in question is not one which we may judicially notice. (See Evid. Code, § 450 et seq.) In addition, the CHP's arrest procedures are not germane to any of the issues presented in this case. We therefore deny the request.

authorities; to deny such an exchange is not reasonable and rewards those federal violators fortunate enough to be arrested by local, rather than federal, officials." (*Gates, supra,* 193 Cal.App.3d at p. 219.) As *Gates* explains, this is a matter of " 'comity and good citizenship.' " (*Ibid.*) Arrest and notification, however, is a far cry from processing such individuals through a state court system with neither mandate for, nor experience in, the application of federal laws. We can find no case that would support that process.

■ Notwithstanding the legality of Kha's arrest, the question remains whether in this state proceeding, the City can invoke and rely solely on federal law to justify a particular sanction (i.e., the destruction of Kha's property) when Kha's conduct was consistent with, and indeed sanctioned under, state law. Amici curiae for the City point out that state courts generally have the authority to "render binding judicial decisions that rest on their own interpretations of federal law." (*ASARCO Inc. v. Kadish* (1989) 490 U.S. 605, 617 [104 L.Ed.2d 696, 109 S.Ct. 2037].) But saying state judges may *interpret* federal law is a far cry from saying they may *invoke* it to punish conduct that is legally permissible under state law. Applying the reasons of *Tilehkooh,* we think judicial enforcement of federal drug policy is precluded in this case because the act in question—possession of medical marijuana—does not constitute an offense against the laws of both the state and the federal governments. Because the act is strictly a federal offense, the state has " 'no power to punish [it] *as such.*' " (*People v. Tilehkooh, supra,* 113 Cal.App.4th at p. 1445, quoting *People v. Kelly, supra,* 38 Cal. at p. 150.) Indeed, we, and all the trial courts in the state, would be astonished if prosecutors began filing federal charges in state courts.

Given the restrictions on state courts' enforcement of federal laws, section 11473.5 cannot be read as requiring the destruction of a controlled substance based solely on the fact that possession of the substance is prohibited under federal law. Unless the substance's possession is also prohibited under state law, the state has no authority to invoke the sanction of destruction set forth in the statute. In other words, the question of whether a substance is lawfully possessed for purposes of section 11473.5 turns on state, not federal law. If, as here, the defendant's possession of a controlled substance is lawful under California law, then the substance is "lawfully possessed" for purposes of that section.

## PREEMPTION

■ Still, "the supremacy clause of article VI of the United States Constitution grants Congress the power to preempt state law. '[S]tate law that conflicts with federal law is "without effect." ' [Citation.]" (*In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1265 [63 Cal.Rptr.3d 418, 163 P.3d 106].)

The City here invokes the preemption doctrine, but not by asking us to declare the CUA and MMP unconstitutional across the board, nor by challenging the right of Californians to use marijuana for medicinal reasons. Rather, it urges us to find the federal drug laws preempt state law to the extent state law authorizes the return of medical marijuana to qualified users.

The City relies primarily on *Gonzales v. Raich, supra,* 545 U.S. 1, but that case was not decided on preemption grounds. The sole issue presented in *Raich* was whether Congress had the constitutional authority under the commerce clause to prohibit the manufacture and possession of marijuana, even when the marijuana was produced and consumed locally in accordance with the CUA. (545 U.S. at p. 15.) Finding the aggregate effect of such local activity could well impact interstate commerce, the court upheld Congress's authority in this regard. (*Id.* at pp. 16–22.)

The *Raich* court was not overly impressed with the fact California had legalized the possession and cultivation of marijuana. Indeed, it noted "[t]he Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail. It is beyond peradventure that federal power over commerce is ' "superior to that of the States to provide for the welfare or necessities of their inhabitants," ' however legitimate or dire those necessities may be. [Citations.] Just as state acquiescence to federal regulation cannot expand the bounds of the Commerce Clause [citation], so too state action cannot circumscribe Congress' plenary commerce power. [Citation.]" (*Gonzales v. Raich, supra,* 545 U.S. at p. 29, fn. omitted.)

This does not mean the CUA is preempted by federal law. The quoted passage simply reflects the realization that, having determined Congress's commerce power extended to local drug activity, it did not matter to the *Raich* court that Californians had voted to legalize medical marijuana under state law. That fact simply did not weigh into the court's consideration in deciding the scope of Congress's authority under the commerce clause.

And understandably so. Doctrinally, the commerce clause focuses on Congress's power to enact legislation in the first place. If Congress has a rational basis for concluding the targeted activity has a substantial effect on interstate commerce, it can regulate it. (*Gonzales v. Raich, supra,* 545 U.S. at p. 22.) Whether the regulation is welcome or unwelcome in the state in which the activity occurs is of no moment. As the *Raich* court explained, states can neither limit nor expand the scope of Congress's authority under the commerce clause. Consequently, the CUA and the contours of that law were completely irrelevant to the issue presented in *Raich.* (See Young, *Just Blowing Smoke? Politics, Doctrine, and the Federalist Revival after Gonzales v. Raich* (2006) 2005 Sup. Ct. Rev. 1, 34.)

The upshot of *Raich* is that the federal government and its agencies have the authority to enforce the federal drug laws, even in a state like California that has sanctioned the use of marijuana for medicinal purposes. However, we do not read *Raich* as extending beyond this particular point, into the realm of preemption. The *Raich* court merely examined the validity of the CSA under the commerce clause; it did not go further and examine the relationship between the CSA and the CUA. (See Note, *California Takes a Hit: The Supreme Court Upholds Congressional Authority over the State-Approved Use of Medicinal Marijuana. Gonzales v. Raich,* 545 U.S. 1 (2005) (2006) 28 U.Ark. Little Rock L.Rev. 545, 580 ["the Court's holding in *Raich* did not address the preemption of the [CUA]"]; Kittrie, *Federalism, Deportation, and Crime Victims Afraid to Call the Police* (2006) 91 Iowa L.Rev. 1449, 1490 [*Raich* "neither declared [the CUA] invalid on preemption or any other grounds nor gave any indication that California officials must assist in the enforcement of the CSA."].) Consequently, the high court's decision did not sound the death knell of the CUA in state court proceedings. (Cf. *People v. Wright, supra,* 40 Cal.4th at p. 89, fn. 5 [noting the parties in that case *both* agreed *Raich* is not implicated in deciding "the applicability of the CUA to state criminal charges"].)[9]

■■■ The fact is, "the structure and limitations of federalism . . . allow the States ' "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." ' [Citation.]" (*Gonzales v. Oregon* (2006) 546 U.S. 243, 270 [163 L.Ed.2d 748, 126 S.Ct. 904] [striking down a federal rule aimed at undermining Oregon's physician-assisted suicide law].) This includes the power to decide what is criminal and what is not. (*Gonzales v. Raich, supra,* 545 U.S. at p. 42 (dis. opn. of O'Connor, J.).) Affording the states broad authority on these matters "promotes innovation by allowing for the possibility that 'a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.' " (*Ibid.;* accord, *United States v. Oakland Cannabis Buyers' Cooperative, supra,* 532 U.S. at p. 502 (conc. opn. of Stevens, J.).) Therefore, any " ' "[c]onsideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] *not* to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.' " ' " (*Jevne v. Superior Court* (2005) 35 Cal.4th 935, 949 [28 Cal.Rptr.3d 685, 111 P.3d 954], italics added, quoting *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [120 L.Ed.2d 407, 112 S.Ct. 2608].)

---

[9] On remand from the Supreme Court, the Ninth Circuit rejected Raich's remaining challenges to the CSA, finding the law does not violate substantive due process or impermissibly infringe upon California's sovereign powers. (See *Raich v. Gonzales* (9th Cir. 2007) 500 F.3d 850.) The court did not discuss the issue of preemption, as it was never raised.

██ This assumption against preemption has particular force in this case. Preemption, it must be remembered, is fundamentally a question of congressional intent. (*In re Tobacco Cases II, supra,* 41 Cal.4th at p. 1265.) And we are adjured to presume *against* preemption unless we find it to be the " ' "clear and manifest purpose of Congress." ' " (*Ibid.,* quoting *Cipollone v. Liggett Group, Inc., supra,* 505 U.S. at p. 516.) ██ But in enacting the CSA, Congress made it clear it did *not* intend to preempt the states on the issue of drug regulation. Indeed, "[t]he CSA explicitly contemplates a role for the States in regulating controlled substances . . . ." (*Gonzales v. Oregon, supra,* 546 U.S. at p. 251.) It provides: "No provision of [the CSA] shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision . . . and that State law so that the two cannot consistently stand together." (21 U.S.C. § 903.) ██ "This express statement by Congress that the federal drug law does *not* generally preempt state law gives the usual assumption against preemption additional force. [Citation.]" (*National Pharmacies, Inc. v. De Melecio* (D.P.R. 1999) 51 F.Supp.2d 45, 54; see also Note, *Guns, Drugs, and . . . Federalism?*—Gonzales v. Raich *Enfeebles the Rehnquist Court's* Lopez-Morrison *Framework* (2006) 61 U.Miami L.Rev. 237, 251 [describing 21 U.S.C. § 903 as a "direct preemption disclaimer"].)

Despite this, the City argues that in enacting the CSA, Congress intended to occupy the field of marijuana regulation so extensively that ordering the return of a defendant's medical marijuana under state law would be absolutely anathema to congressional intent. We cannot agree. It's abjuration of preemption is simply too clear. Congress enacted the CSA to combat recreational drug abuse and curb drug trafficking. (*Gonzales v. Oregon, supra,* 546 U.S. at p. 271; *Gonzales v. Raich, supra,* 545 U.S. at pp. 10–13.) Its goal was not to regulate the practice of medicine, a task that falls within the traditional powers of the states. (*Gonzales v. Oregon, supra,* 546 U.S. at p. 269.) Speaking for the majority in *Gonzales v. Oregon,* Justice Kennedy explained, "The [CSA] and our case law amply support the conclusion that Congress regulates medical practice insofar as it bars doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood. *Beyond this, however, the statute manifests no intent to regulate the practice of medicine generally.*" (*Ibid.,* italics added.)

██ The CUA does not authorize doctors to use their prescription-writing powers "to engage in illicit drug dealing and trafficking as conventionally understood." Instead, the act grants doctors the authority to recommend marijuana to their patients for medicinal purposes. No other use is contemplated. As a matter of fact, the CUA provides that it shall not "be construed to

supersede legislation prohibiting persons from engaging in conduct that endangers others, nor to condone the diversion of marijuana for nonmedical purposes." (§ 11362.5, subd. (b)(2).) Similarly, nothing in the MMP "shall authorize the individual to smoke or otherwise consume marijuana unless otherwise authorized by this article, nor shall anything in this section authorize any individual or group to cultivate or distribute marijuana for profit." (§ 11362.765.)

These restrictions are consistent with the goals of the CSA. Irrespective of Congress's prohibition against marijuana possession, "[i]t is unreasonable to believe that use of medical marijuana by [qualified users under the CUA] for [the] limited purpose [of medical treatment] will create a significant drug problem" (*Conant v. McCaffrey* (N.D.Cal. 1997) 172 F.R.D. 681, 694, fn. 5, affd. *Conant v. Walters, supra,* 309 F.3d 629), so as to undermine the stated objectives of the CSA. (Cf. *Gonzales v. Oregon, supra,* 546 U.S. at p. 273 [state initiative allowing doctors to prescribe controlled substances for the purpose of facilitating a patient's suicide is not inconsistent with the CSA's objective to prevent recreational drug use].)

It is even more unreasonable to believe returning marijuana to qualified patients who have had it seized by local police will hinder the federal government's enforcement efforts. Practically speaking, this subset of medical marijuana users is too small to make a measurable impact on the war on drugs. Not only are their numbers meager, persons seeking the return of their medical marijuana are not entitled to possess the drug in such quantities as would make them likely candidates for federal prosecution. (See *Conant v. Walters, supra,* 309 F.3d at p. 646, fn. 10 (conc. opn. of Kozinski, J.) [noting federal prosecutors typically pursue marijuana charges only in cases involving the cultivation of over 500 indoor plants or 1,000 outdoor plants, or the possession of more than 1,000 pounds of the drug].) Upholding the return of Kha's 8.1 grams of marijuana would simply not constitute a real or meaningful threat to the federal drug enforcement effort. This is not a case in which preemption is necessary to the federal scheme.

In considering the City's preemption argument, it is also important to recognize what the CUA does *not* do. It does not expressly "exempt medical marijuana from prosecution under federal . . . law." (*U.S. v. Cannabis Cultivators Club* (N.D.Cal. 1998) 5 F.Supp.2d 1086, 1100.) "[O]n its face," the act "does not purport to make legal any conduct prohibited by federal law; it merely exempts certain conduct by certain persons from California drug laws." (*Ibid.*) While in passing the CUA the voters may have wanted to go further and actually exempt marijuana from prosecution under federal law, a result which would have led to an irreconcilable conflict between state and federal law (5 F.Supp.2d at p. 1100), we know from *Raich* that the commerce

clause forecloses that possibility. So, what we are left with is a state statutory scheme that limits state prosecution for medical marijuana possession but does not limit enforcement of the federal drug laws. This scenario simply does not implicate federal supremacy concerns. (*U.S. v. Cannabis Cultivators Club, supra*, 5 F.Supp.2d at p. 1100.)[10]

Our conclusion in this regard finds support in the case of *Hyland v. Fukuda* (9th Cir. 1978) 580 F.2d 977. There, the Ninth Circuit Court of Appeals ruled a Hawaii law allowing felons to carry guns was not preempted by a federal law prohibiting such conduct. The court reasoned the state law "has no impact on the legality of the same act under federal law. Simply put, Congress has chosen to prohibit an act which Hawaii has chosen not to prohibit; there is no conflict between [the federal law] and [the state law]." (*Id.* at p. 981.)

Similarly, here, there is no conflict based on the fact that Congress has chosen to prohibit the possession of medical marijuana, while California has chosen not to. California's statutory framework has no impact on the legality of medical marijuana under federal law: "Enforcement of the CSA can continue as it did prior to the [CUA]." (*Gonzales v. Raich, supra*, 545 U.S. at p. 63 (dis. opn. of Thomas, J.).)

In arguing for preemption, the City relies on *Frazier v. State* (Alaska 1977) 566 P.2d 1023, which was decided two years after the Alaska Supreme Court ruled "that possession of marijuana by adults at home for personal use is constitutionally protected" by the right of privacy contained in the Alaska and United States Constitutions. (*Ravin v. State* (Alaska 1975) 537 P.2d 494, 511.) In the wake of this ruling, the defendant in *Frazier* was charged with possessing marijuana in his car. (*Frazier v. State, supra*, 566 P.2d at p. 1023.) After the charge was dismissed, he sought the return of his marijuana, but the lower courts denied the request on the ground that marijuana possession is prohibited under federal law. (*Ibid.*) On appeal to the Alaska Supreme Court, the defendant argued the federal law violated his right to privacy under the United States Constitution. (*Frazier*, at p. 1024.) However, in a curt, almost dismissive four-paragraph opinion, the *Frazier* court rejected this argument and determined that in light of the federal prohibition against marijuana, supremacy principles precluded the defendant from getting his marijuana back. (*Ibid.*)

---

[10] The controversy in the *Cannabis Cultivators Club* case centered on whether qualified patients can invoke the medical necessity defense when facing prosecution for manufacturing and distributing marijuana under the CSA. The United States Supreme Court had the final say in the matter and answered that question in the negative. (*United States v. Oakland Cannabis Buyers' Cooperative, supra*, 532 U.S. 483.) However, that ruling has no bearing in this case because the court's decision turned exclusively on the interpretation of federal law. (See *People v. Mower, supra*, 28 Cal.4th at p. 465, fn. 2.)

Noticeably absent from the lead opinion in *Frazier* is any substantive analysis to support its holding. The opinion does not even mention whether the defendant's marijuana possession—having occurred in a car and not a home—was legal under state law. Justice Connor raised this point in his concurring opinion and argued that if the defendant's possession was in fact protected by the right of privacy in the Alaska Constitution, then the federal prohibition would not be controlling on the return of property issue. (*Frazier v. State, supra,* 566 P.2d at p. 1024.) In that situation, an order compelling the return of the defendant's marijuana would be entirely valid, according to Justice Connor, because it "would not be one of 'interposition' by Alaska to prevent the enforcement of federal law. The federal authorities could still act immediately after the material was placed in the possession of the defendant." (*Ibid.*) In other words, the supremacy clause would not prevent the return of the defendant's marijuana. But the *Frazier* majority did not address this issue.

We share Justice Connor's viewpoint in this regard. Since Kha's possession of marijuana is legal under state law, we do not believe the trial court's order interferes with, or is preempted by, federal law. Admittedly, there is tension between state and federal drug policy on the issue of medicinal marijuana. It is quite clear California has chosen a policy that is at odds with the federal government's. But the important point for purposes of this case is that state law does not interfere with the federal government's prerogative to criminalize marijuana. As a general rule, it is still illegal to possess marijuana under federal law, and nothing in this opinion should be construed as suggesting otherwise. In fact, our holding with respect to the preemption issue presented in this case is very narrow. All we are saying is that federal supremacy principles do not prohibit the return of marijuana to a qualified user whose possession of the drug is legally sanctioned under state law.[11]

## DUE PROCESS AND THE RIGHT TO THE RETURN OF LAWFULLY POSSESSED PROPERTY

Nevertheless, as the City points out, neither the CUA, the MMP nor section 11473.5 *expressly* provides for the return of lawfully possessed marijuana that has been seized by the police. The City sees this as a legal impediment to ordering the return of Kha's marijuana, but it fails to recognize the police cannot retain a person's property without running afoul

---

[11] The broader issue of whether federal law generally preempts California's medical marijuana laws is, as we have explained, not before us. However, we note that last year a superior court judge in San Diego rejected a sweeping challenge to the CUA and MMP on preemption grounds. (See *County of San Diego v. San Diego NORML* (Super. Ct. San Diego County, 2006, Nos. GIC860665 & GIC861051).) That decision is currently being appealed to our colleagues in Division One.

of basic constitutional considerations. Particularly, the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." (U.S. Const., 14th Amend., § 1; see also Cal. Const., art. I, § 15.) It is beyond dispute that " '[t]he right to regain possession of one's property is a substantial right . . . .' [Citation.] Continued official retention of legal property with no further criminal action pending violates the owner's due process rights. [Citation.]" (*People v. Lamonte* (1997) 53 Cal.App.4th 544, 549 [61 Cal.Rptr.2d 810].)

In *Lamonte*, the People objected to the defendant's motion for the return of various telephone and computer equipment on the ground it was used to facilitate credit card fraud. However, because the defendant was not convicted of fraud, and because the items were not contraband per se, the court determined due process compelled their return to the defendant. (*People v. Lamonte, supra*, 53 Cal.App.4th at pp. 551–553.) Even though the defendant was convicted of other offenses and had shown himself capable of using the property for fraudulent purposes, the court ruled a "court may not refuse to return legal property to . . . deter possible future crime." (*Id.* at p. 553.) Other courts have similarly invoked due process principles to ensure the return of lawfully possessed property. (See, e.g., *Ensoniq Corp. v. Superior Court* (1998) 65 Cal.App.4th 1537 [77 Cal.Rptr.2d 507] [due process required court to grant claimant's motion for return of intellectual property where circumstances indicated claimant acquired property lawfully]; *People v. Superior Court (Loar), supra*, 28 Cal.App.3d at pp. 614–615 [continued police retention of legally protected adult films would constitute a "patent denial of due process"]; *Franklin v. Municipal Court* (1972) 26 Cal.App.3d 884, 896–897 [103 Cal.Rptr. 354] [consistent with due process principles, defendant was entitled to the return of a revolver he was lawfully entitled to possess].)

The City pays little heed to this line of authority and instead directs our attention to our own decision in *Chavez v. Superior Court* (2004) 123 Cal.App.4th 104 [20 Cal.Rptr.3d 21]. In that case, the police seized over 10 pounds of marijuana and 46 marijuana plants from the defendant, but charges against him were dismissed in the furtherance of justice because he was already serving time on another case. (*Id.* at p. 107.) The defendant sought the return of a "reasonable amount" of marijuana for medicinal purposes, but it was clear—based on the amount of marijuana he had—he was not a qualified user under the CUA. (123 Cal.App.4th at pp. 108–111.)[12] That being the case, he was not in lawful possession of the marijuana for purposes of section 11473.5, and therefore the marijuana had to be destroyed. (123

---

[12] As set forth in the MMP, a qualified patient may generally possess up to eight ounces of dried marijuana and may maintain up to six mature or 12 immature marijuana plants. (§ 11362.77, subd. (a).) With his 10 pounds of dried marijuana and 46 marijuana plants, the defendant in *Chavez* far exceeded these limits.

Cal.App.4th at p. 111.) In so holding, this court also noted that nothing in the CUA "requires, or authorizes, the . . . return [of] confiscated marijuana." (123 Cal.App.4th at p. 111, fn. omitted.) However, even if it did, it would not have helped the defendant in *Chavez* because, given the amount of marijuana found in his possession, he was not entitled to the CUA's protections in the first place. (123 Cal.App.4th at p. 110.)

The present case is factually inapposite to *Chavez*, given that Kha was in lawful possession of his marijuana under state law. Even though state law is silent as to whether a qualified patient like Kha is entitled to the return of his marijuana once criminal charges against him have been dismissed, due process principles seem to us to compel that result. Continued official retention of a qualified patient's marijuana simply cannot be squared with notions of fundamental fairness. The City no doubt has every right to retain a defendant's marijuana if it is pursuing a marijuana-related prosecution against him, or if the defendant's possession does not comport with the CUA. In those situations, the law clearly contemplates the destruction of the subject marijuana. (See *Chavez, supra*, 123 Cal.App.4th 104; § 11473.5 [discussed above]; see also § 11475 [calling for the forfeiture of controlled substances that were illegally possessed]; Pen. Code, §§ 1413 [allowing the police to retain property that is subject to forfeiture], 1417.6 [authorizing the destruction of court exhibits, including narcotics, that are unlawful to possess].)

But neither of those circumstances exist here. Withholding small amounts of marijuana from people like Kha who are qualified patients under the CUA would frustrate the will of the people to ensure such patients have the right to obtain and use marijuana without fear of criminal prosecution or sanction. (§ 11362.5, subd. (b)(1)(A), (B).) It would also, as explained, be inconsistent with due process, as well as other provisions of the law that contemplate the return of lawfully possessed property. (See, e.g., Pen. Code, §§ 1417.5 [return of exhibits in criminal case], 1540 [restoration of property that was wrongfully taken pursuant to search warrant], 1538.5, subd. (e) [return of property subject to successful search or seizure motion].)

We are convinced, therefore, that the reasoning of *Chavez* is inapt here. The distinguishing feature between that case and this one is that Kha, unlike the defendant in *Chavez*, is a qualified patient whose marijuana possession was legally sanctioned under state law. That is why he was not subjected to a criminal trial, and that is why the state cannot destroy his marijuana. It is also

why the police cannot continue to retain his marijuana. Because Kha is legally entitled to possess it, due process and fundamental fairness dictate that it be returned to him.[13]

## THE TENTH AMENDMENT AND OTHER CONSIDERATIONS

In light of our holding that federal law does not control the outcome of this case, we need not consider the arguments put forth by Kha and the Attorney General as to why ordering the destruction of Kha's marijuana pursuant to federal law would violate the Tenth Amendment, which reserves the residual powers of the federal government to the states or the People. (See generally *Conant v. Walters, supra*, 309 F.3d at pp. 645–646 (conc. opn. of Kozinski, J.) [arguing that the federal government cannot force state officials to enforce the federal marijuana laws without running afoul of the "commandeering doctrine."].) Resolution of the Tenth Amendment issue is simply unnecessary, given our previous conclusions. We therefore turn to the arguments raised by amici curiae on behalf of the City.

Amici curiae argue the police should not have to return Kha's marijuana to him, even though he is qualified to use the drug for medical reasons under California law.[14] Characterizing Kha as a "criminal defendant," amici curiae claim the CUA only provides him with a "defense" to certain offenses and does not make his possession of medical marijuana "lawful." But Kha is clearly *not* a criminal defendant with respect to the subject marijuana. Since the prosecution dismissed the drug charge he was facing, he is nothing more than an aggrieved citizen who is seeking the return of his property. The terms "criminal" and "defendant" do not aptly apply to him.

Furthermore, our Supreme Court has ruled that when applicable, the CUA "renders possession and cultivation of . . . marijuana noncriminal for a qualified patient or primary caregiver." (*People v. Mower, supra*, 28 Cal.4th at p. 471.) The possession and cultivation become "no more criminal . . . than the possession and acquisition of any prescription drug." (*Id.* at p. 482.) Translation: Medical marijuana is "lawful" under the terms and conditions set forth in the CUA.

---

[13] The out-of-state decisions cited by the City are distinguishable because the property involved in those cases, in addition to being prohibited under federal law, was also illegal to possess, and thus subject to nonreturn and forfeiture, under state law. If Kha's marijuana were contraband under state law, it too would be subject to nonreturn and forfeiture, just like the pirated compact discs in *State v. Cohen* (2006) 154 N.H. 89 [907 A.2d 983], the firearm in *State v. One Uzi Semi-automatic 9mm Gun* (Me. 1991) 589 A.2d 31, and the wild animals in *Com. v. Reynolds* (Pa. 2005) 876 A.2d 1088.

[14] Amici curiae do not dispute Kha is a qualified medical marijuana user.

Like the City itself, amici curiae also fear the Garden Grove police would be violating federal law by returning Kha's marijuana to him. However, instead of relying on aiding and abetting principles, amici curiae go a step further than the City and argue the police would be in direct violation of federal law were they to comply with the trial court's order. They point out that distribution of a controlled substance is generally prohibited under 21 United States Code section 841(a)(1), but that section does not apply to persons who regularly handle controlled substances in the course of their professional duties. For example, in *U.S. v. Feingold* (9th Cir. 2006) 454 F.3d 1001, 1008, the court held that 21 United States Code section 841(a)(1) could only be applied to a doctor if, in distributing a controlled substance, he intended "to act as a pusher rather than a medical professional." (Relying on *United States v. Moore* (1975) 423 U.S. 122 [46 L.Ed.2d 333, 96 S.Ct. 335].)

By analogy, it would stand to reason that the only way a police officer could be found in violation of 21 United States Code section 841(a)(1) for distributing a controlled substance is if he or she intended to act as a drug peddler rather than a law enforcement official. In this case, it is quite obvious the police do not want to give Kha his marijuana back at all, let alone have him use it for illicit purposes. They are acting under the compulsion of a lawful court order. Therefore, we cannot see how anyone could regard compliance with this order a violation of 21 United States Code section 841(a)(1).

Assuming someone could, it seems to us clear the police would be entitled to immunity under 21 United States Code section 885(d). As discussed above, that statute provides immunity to law enforcement personnel who are responsible for handling controlled substances as part of their official duties. (See, *ante*, at pp. 368–370.) From a legal standpoint, that should alleviate any fears the Garden Grove police have about returning Kha's marijuana to him. As a practical matter, moreover, it seems exceedingly unlikely that federal prosecutors would ever attempt to haul a local constable into federal court for complying with a state judicial order calling for the return of a qualified patient's medical marijuana. We are not aware of a single instance in which this has ever occurred. We are confident, had there been such a phenomenon, it would have been brought to our attention.

Amici curiae for the City also claim that ordering the return of Kha's marijuana is ill advised as a matter of public policy because local police are held to a high moral standard, they often cooperate with federal drug enforcement efforts, and they are generally charged with enforcing and administering "the law of the land," which includes federal law. We appreciate these considerations and understand police officers at *all* levels of government have an interest in the interdiction of illegal drugs. But it must be

remembered it is not the job of the local police to enforce the federal drug laws as such. For reasons we have explained, state courts can only reach conduct subject to federal law if such conduct also transcends state law, which in this case it does not. To the contrary, Kha's conduct is actually sanctioned and made "noncriminal" under the CUA. (*People v. Mower, supra,* 28 Cal.4th at p. 471.)

That may cause a dilemma for local narcotics officers in some instances, but it strikes us as being an entirely manageable consequence of our federal form of government. By complying with the trial court's order, the Garden Grove police will actually be facilitating a primary principle of federalism, which is to allow the states to innovate in areas bearing on the health and well-being of their citizens. Indeed, "[o]ur federalist system, properly understood, allows California and a growing number of other States [that have authorized the use of medical marijuana] to decide for themselves how to safeguard the health and welfare of their citizens." (*Gonzales v. Raich, supra,* 545 U.S. at p. 74 (dis. opn. of Thomas, J.).) The CUA and MMP are clear manifestations of that decisionmaking process.

By returning Kha's marijuana to him, the Garden Grove police would not just be upholding the principles of federalism embodied in the United States Constitution, however. They would also be fulfilling their more traditional duty to administer the laws of this state. In that sense, the trial court's order comports with an officer's dual obligation to support and defend both the California Constitution and the Constitution of the United States. (See Cal. Const., art. XX, § 3.)[15]

Mindful as we are of the general supremacy of federal law, we are unable to discern any justification for the City or its police department to disregard the trial court's order to return Kha's marijuana. The order is fully consistent with state law respecting the possession of medical marijuana, and for all the reasons discussed, we do not believe the federal drug laws supersede or preempt Kha's right to the return of his property. That right has its origins in the CUA and MMP, but it is grounded, at bottom, on fairness principles embodied in the due process clause. Those principles require the return of Kha's property.

---

[15] This provision of the California Constitution requires police officers to "take and subscribe the following oath or affirmation: [¶] 'I, ___, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution of the State of California against all enemies, foreign and domestic; that I will bear true faith and allegiance to the Constitution of the United States and the Constitution of the State of California; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties upon which I am about to enter.' "

## DISPOSITION

The petition is denied.

Aronson, J., and Fybel, J., concurred.

Petitioner's petition for review by the Supreme Court was denied March 19, 2008, S159520.